Good morning, Your Honor. I'm Randall Quinn for the SEC. This is an insider trading case brought under the misappropriation theory of liability for insider trading. The district court in this case created a new requirement for liability. The district court then granted summary judgment to Talbot on the ground that his conduct did not satisfy this new requirement. This new requirement created by the district court is contrary to the rationale for the misappropriation theory that was endorsed by the Supreme Court in United States v. O'Hagan. This new requirement is also not supported by any prior case under the misappropriation theory. And for these reasons, the district court's grant of summary judgment to Talbot should be reversed. The key facts here can be summarized very briefly. Talbot was a director of Fidelity National Financial. Fidelity was a major shareholder of LendingTree. Talbot attended a Fidelity board meeting. At this board meeting, it was discussed that LendingTree was likely to be acquired by a third party. This was very important to Fidelity. Fidelity stood to make a profit of about $50 million if this transaction went through. It's also important to LendingTree that it secure Fidelity's votes as well. That's another reason why it was important. LendingTree wanted an agreement from Fidelity to vote its shares in favor of the acquisition. Fidelity owned, there's some dispute, it doesn't matter, perhaps 8 or 9 percent of LendingTree's shares. So a major shareholder of LendingTree. Talbot used this information, which was nonpublic at the time, he used the information to buy LendingTree stock. Then there was a public announcement of the LendingTree acquisition, and Talbot sold his shares at a profit. One element, which is the key here, is that there must be a breach of duty to the source of the information. Breach of duty to what? To the source of the information. Distort the information? The source, Your Honor, the source of the information. Oh, okay, the source. Where is the information coming from? A breach of duty to the source of the information. Now, in this case, Fidelity, Fidelity was Talbot's source. Talbot breached a duty to Fidelity. That is sufficient under O'Hagan. Isn't one of the key questions here whether you waived that argument before the district court? I mean, that's what the opposing counsel argues. And I guess in oral argument, you seem to concede that there wouldn't be liability under the misappropriation theory unless there was also a duty to LendingTree between Fidelity and LendingTree. No, Your Honor. We did not concede that. There are two steps to this. They argued that this argument was never raised below, and in fact, it was the basis of our complaint. Our complaint alleged, the only duty alleged in the complaint was the duty that Talbot owed to Fidelity. So we made the argument. We argued it in our papers. I think what they point to is really what they claim, an abandonment of this point at the oral argument. But I think if you read the transcript, the oral argument as a whole, there was no such abandonment. Commission counsel, in addressing the duty issue, said the duty that's at stake here is the duty between Talbot and Fidelity. The judge then asked, well, what about a duty between Fidelity and LendingTree? This was an alternative argument that had been briefly touched on below, which was if a duty is needed, it's present. So in response to a question at a hearing from the judge, what about this other duty, counsel said, yes, I will now address it. If you look at this in context, it's one thing to say, yes, if another duty is required, it's present, so the commission on these facts would win anyway. I think the key thing on waiver is the district court in its opinion, in its opinion, stated the SEC's position is that the only relevant duty in this case is the duty between Talbot and Fidelity. So the district court did not think there was any concession. And frankly, Your Honor, if the district court had said the SEC appears to have abandoned this, we would have sought reconsideration. So I don't think it's fair to say that this point was waived. It has been theory of the commission throughout the case. Let me ask you another question. Is it the government's position that Talbot would be liable for an SEC violation if he had disclosed to Fidelity that he was going to purchase LendingTree stock or that he had purchased LendingTree stock? Well, Your Honor, the answer to that is if he disclosed in advance. This goes to the point, I mean, the Supreme Court said in O'Hagan, there has to be a deceptive breach of duty. There's no issue of deception here. Full disclosure, the Supreme Court said, cures deception. But in our view, it can't be after you get the information, you say, oh, by the way, I'm going to use it. It has to be you're in a position of trust and you say, oh, by the way, I'm going to use it. You say before the person you owe a duty to tells you something important. You say, by the way, if in the course of this relationship you tell me things, I'm going to feel free to use them. In that case, you are no longer deceiving the person you owe a duty to. So that's one. Some people say loophole, but that's one situation where if full disclosure is made, there's no deception. Well, was Mr. Talbot under a duty to keep the lending tree information confidential? Oh, yes, yes. We think he was under a duty. To Fidelity? Yes, definitely. There's a number of factors that are relevant to this question of is the information confidential. We have nonpublic information. It's discussed at a closed Fidelity board meeting. And as was mentioned briefly before, it's information that is very confidential. It's very important, very important to Fidelity to have a potential transaction that will lead to a large, large profit. It concerns, you know, a central function of the business of Fidelity's board is to make this sort of decision. Should Fidelity vote to, you know, support this transaction? How was Fidelity injured by Mr. Talbot's trading in lending tree? There are several ways Fidelity is injured. First, Talbot's use of information that belongs to Fidelity, that Fidelity has for lawful purpose, that relates to Fidelity's business, that is an invasion of Fidelity's property rights. And the Supreme Court in Hagen and the court in Carpenter and some other decisions of the misappropriation theory do that. So you have to deal with this question that if you have information that's confidential information, you have a property right in that. You have a right to prevent someone who owes you a duty from taking that information for their own profit. That's one aspect of harm. There's also ---- I think, well, I think there's both actual and potential harm. The point I was trying to make is that that's, that invasion of property rights is in itself, is in itself a harm to Fidelity. But if I could just briefly, there are other aspects to this. It could be damaging to Fidelity's reputation, the reputation of Fidelity's board. I think most people would assume that this type of information, despite the fact that it's confidential, could be damaging to Fidelity's reputation. So there's reputational harm. There's also a potential harm. And our view is, in this question of harm, that either harm or potential harm is sufficient. The potential harm is that Talbot's trading could have derailed this transaction. We have a company, and I agree, this is speculative, but we're talking about a company that could have derailed this transaction. We're talking about potential harm now. A company has a non-public plan to acquire another company at, you know, a certain price. If that leaks out because someone is trading shares in the target, well, the target price shares could go up. Perhaps the acquirer wouldn't want to pay as much. Perhaps the price would change and so on. And because Fidelity had such a large stake in this transaction going through, if information leaks out and people are using that information, it could be damaging to Fidelity's reputation. to trade lending tree shares, that could harm Fidelity. That could potentially, it didn't happen here, it could potentially do. Fidelity's profit, they could stand to lose profits if the acquisition price went to a higher level because there was increased trading in the market and people were observing that. It could not only derail the merger, it could raise, I mean, it could limit the profits Fidelity and Fidelity shareholders stood to gain. Yes, Your Honor, I suppose there's two. I suppose the narrow aspect of this, it could raise the price, that way Fidelity would make less of a profit. More dramatically, it could conceivably derail the entire acquisition. If there was widespread trading in a target and the price might, the target's price might go up so rapidly that the acquirer will decide it's not worth it. So I believe there's both actual harm and potential harm to Fidelity. So suppose we agree with you, suppose we agree your theory of misappropriation is correct, that there's only potential harm or reputational harm. What is, what kind of remedy is there or damages is there? Well, Your Honor, I don't Or how do you measure that? I don't believe that the question of harm is relevant to damages in a case brought by the SEC. This Because you're seeking disgorgement of profits or In this case, we're seeking an injunction, disgorgement, officer and director bar, a civil penalty. There's a panoply of remedies that the SEC is entitled to. But I'd like to try and clarify a point. If you look at common law fraud cases and then there's a debate, is harm required to show damages? And frankly, you can see two lines of cases under the common law. The position we took here is that on appeal, since it's so clear there's harm, you don't have to get into this. Our view, though, is that you don't need harm to show a breach of duty. I think under Delaware law, that is the view. But assuming you need harm to show a breach, it's present here. The SEC, in a case brought by the SEC, I don't believe harm is relevant, is relevant to damages. Can I ask you also about the other finding of the, or holding of the district court about materiality? Yes. Now, why isn't there a genuine issue of material fact in this case? Our view is that any reasonable investor considering, look at this information, would think it is important. And I will first concede, ordinarily, materiality is a factual question. But the Supreme Court recognized in the Northway case, there can be some instances where information is material as a matter of law. And so we have to look at this from the perspective of, you know, the Supreme Court. And then what was the information that was discussed at a Fidelity board meeting? First of all, it's a Fidelity board meeting. Fidelity is a major shareholder of LendingTree. The information that was discussed included that this potential acquisition of LendingTree would be at a substantial premium over the current market price. A specific price range was discussed at the Fidelity board meeting. And to me, I think probably the most, the strongest point for materiality is that the reason this information about a LendingTree acquisition was being discussed at a Fidelity board meeting was to see if the Fidelity board would agree to vote their shares in favor of the transaction. Now, I think if you add all that up from the perspective of a reasonable investor considering buying or selling LendingTree, I think any reasonable investor would think the information is important in making an investment decision. It doesn't have to be decisive. It just has to be another way to look at it. Would any reasonable investor in LendingTree not think it's important to know all these things that were discussed at the Fidelity board meeting? But there was a dispute, right, about what exactly was said at the board meeting. We believe that that is not sufficient to create a genuine issue for summary judgment. And our argument is this. There is testimony, mainly by Foley, Fidelity's CEO, that this is not sufficient to create a genuine issue for summary judgment. And our argument is this. And then Talbot says, but I don't remember them being said. Our view is that that is not enough to create a dispute concerning what was said. And the second step of our argument is, okay, look at what was said. If you look at what was said, that is sufficient to show materiality as a matter of law. If you look at what Mr. Talbot says was said in his deposition, which would be viewing the evidence in the light most favorable to the non-moving party, considering your cross-motion, what he says was said, and he doesn't recall the exact words, that some person or company might be interested in acquiring LendingTree, and that Fidelity would benefit if the transaction occurred. Now, is that sufficient? That's undisputed. That's what Mr. Talbot says. Is that sufficient to make it material? Your Honor, if that is all you have, I would say there would still be a factual issue. And what would the factual issue be? The factual issue would be what's left out of that, as I think the things that Foley testified, specifically, would be left out of that. I would say that a specific price range was mentioned. That's very important. Also, the reason that this information was being discussed was so that Fidelity Board could make a decision as to what to do. However, let me just add one other thing into the mix here. One factor courts have looked at in materiality is what happened when the information was disclosed. In this case, there was a 41 percent jump in the stock price of LendingTree once the information was disclosed. So that's very strong. Once information is disclosed, price jumps 41 percent. That is very strong evidence of materiality. Your Honor, I'd like, unless there are any further questions, I'd like to reserve the balance of my time for rebuttal. All right. You may. Thank you. Good morning, Your Honors. My name is Richard Marmoreau, and I represent the appellee in this case, Tom Talbot. On April 18th or 19th of 2003, when Grant Bickett, Fidelity's VP of Mergers and Acquisitions, received a call from Douglas Lebda of LendingTree, Mr. Lebda informed him of a possible takeover of LendingTree by an unnamed third party. At that moment in time, there was no obligation on the part of Fidelity to not buy or sell shares of LendingTree stock in the open market. The district court correctly found that there was no confidentiality restriction on that conversation. The district court correctly found that there was no fiduciary duty owed by Fidelity to LendingTree, and the law is clear that one person cannot unilaterally impose a fiduciary duty or a duty of confidentiality on another. On April 22nd, 2003, the Fidelity board met. Bill Foley, the chairman, at the end of a four- or five-hour meeting which discussed agenda items, made brief mention of a possible transaction. There was no mention of a definitive price, terms, acquiring party, or when the potential transaction might close. So what was announced there, what was mentioned there, was not a merger. It was just what I said, that there was a potential transaction. Foley did not say the information was confidential, nor did he say the trading was prohibited. Isn't there, when you're a member of a board of a public company, a duty of confidentiality? Your Honor, not a blanket duty of confidentiality. You mean blank duty. Blanket duty to me means everything that is said at a board meeting is confidential. And the SEC concedes that not all information conveyed at a board meeting is confidential. Some is, there's no question about that, but there's no blanket rule of confidentiality at board meetings. Moreover, the Fidelity board did not have a policy prohibiting its board members from trading in the stock of its portfolio companies. Lending trade was a portfolio company. Our principal argument here, Your Honors, is that the SEC is trying to extend the misappropriation theory beyond bounds and reason to apply the conduct that far exceeds the conduct in O'Hagan, and to hold as a matter of law that a person is liable for insider trading if he or she receives information during his employment, even if the information originates from a source to whom the defendant and the employer owe no fiduciary duty. Excuse me. I'm sorry. Could I just go back to this disclosure, this fiduciary duty to the board issue? The SEC cites a case from the Delaware Supreme Court saying it's an act of disloyalty for a fiduciary to profit personally from the use of information, security, and confidential relationship, even if such profit or advantage is not gained at the expense of the fiduciary. Why isn't that applicable to the directors of a board, of a corporation of that sort? I think in general it may be, but I think more specifically the restatement that we cite, which embodies the general principles of law, I think is more apt. And it says you need two things for a breach of a fiduciary duty. You need harm to the board, to the company, and you need a confidentiality. Here, this information was not confidential in the sense that I think the case law speaks of. But more importantly, there was no harm to fidelity. I think you need both to support a breach of a fiduciary duty. Now, you disagree with the harms that were suggested by the SEC to reputation that embezzlement in essence of the property and derailing the transaction? Yes, Your Honor, yes, Your Honor, I do. Number one, there's no evidence of that in the factual record. Number two, there was no allegation of that below. It's a very important point. The Ninth Circuit, in the only case that really discussed the misappropriation theory in Judge Thompson, was on the panel. Judge Hall, in the Clark case in 1990, talked about the need, the implicit need for harm to the source of the information. Harm meaning injury. Here, there's a vacuum here because the information didn't belong to Fidelity. The information belonged to LendingTree, and LendingTree gave the information to Fidelity in a nonprivileged, nonconfidential context. But once Fidelity had the information, wasn't it Fidelity's information? No, I don't believe they own the information. I believe under the law they become the purveyor of the information, and I don't believe there's any case other than the Willis case in the Southern District of New York, which we submit, respectfully, was wrongfully decided. There's no case that says you have a fiduciary duty to the purveyor of the information, and if you breach that, you've committed securities fraud. Because if that were the law, that would untether the communication of the information from the securities law. For example, if a patient overhears information in an elevator on the way up to his doctor's office, not knowing whether or not it's confidential inside information, and repeats it to the doctor, and then the doctor trades, under the SEC's theory, that would be a misappropriation under the federal securities law. In O'Hagan, though, isn't there's GrandMAT, which is making the tender offer, and there's the law firm. And the Supreme Court said that Mr. O'Hagan had breached his duty to both the law firm and to GrandMAT. Isn't the law firm, under your theory, just a purveyor of information, so there couldn't have been a breach? Yes, but I think that's a fair statement, Your Honor. But I think that O'Hagan, and I think that's the essence of the dispute here, the O'Hagan court repeatedly talks about the duties to both the law firm and the original source of the information, the owner of the information, GrandMAT. That's an important discussion, because if the law were, as the SEC postulates, then the Supreme Court in O'Hagan would have said that Mr. O'Hagan violated the federal securities laws when he took his law firm's information. But it didn't say that. Well, it did say, though, that if he had disclosed before trading only to GrandMAT and not to the law firm, then there would still potentially be a breach as to the law firm, which suggests that the Supreme Court was treating them as separate, separately owed duties. But I don't think that it was treating it in that way, Your Honor. I don't think it was saying that they didn't owe separate duties to both. I just think it's obvious that if you owe duties to two and you disclose to one, that doesn't fulfill your obligation of full disclosure. I don't think that argument necessarily follows. Nor does the argument follow that because there happen to be duties owed to two people, two entities in that case, that it always requires that a duty is owed to both parties. I think that's a fair statement, Your Honor. But I would say this. I think while it's not obvious that that follows, I think if you look at the opinion and if you look at the precedent that it cites, every case that has come down in the misappropriation law except for Willis, which I think is an outlier, talks about the harm to the original source of the information. In general, the original source of the information is a market participant. Well, how do you analyze U.S. v. Carpenter? Well, Carpenter's, in my view, a very straightforward case. First of all, there was only one source in Carpenter. We don't have multiple sources as we have here. There is one source of information. See, I'm seeing this as a one-source case. Respectfully, Your Honor, we see this as the originating source of the information and the owner of the information being LendingTree. Well, suppose we, suppose I were to see it as Fidelity was the Fidelity board or Fidelity Company was the source of the information. And that's, well, certainly Mr. Talbot did not get the information from LendingTree. Mr. Talbot got the information at a Fidelity board meeting. Right, but he had a derivative. In that theory, he would have had a derivative duty if such existed to the originating source. I mean, I think that's the way to analyze it, and I don't believe he did have a derivative duty to the originating source, much like O'Hagan had a derivative duty to the originating source of the information, the owner of the information. But let me talk about Carpenter. Carpenter, there was a duty owed to the Wall Street Journal. That's correct, but that was the owner of the information. It was the Wall Street Journal's information. Here, I don't think it can be said. But didn't that information come, it was heard on the street, so the information came from the various market participants. In a different context, Your Honor, most respectfully. It did not come from confidential communications. It came from essentially publicly available information around the street that the Wall Street Journal cobbled together in a heard-on-the-street article. I believe, and the Supreme Court, by the way, evenly divided on the issue of the application of the misappropriation theory. In fact, a professor that is cited in the O'Hagan opinion called it, you know, unusual or some adjective like that. Carpenter, I think, is a case which stands for the proposition that in a single-source case, if an employee defrauds its employer of information that is owned by the employer, then the court can find misappropriation liability. I think that's all it says. I don't think it goes as far as the SEC would have. And, Your Honor, if it did, if that were the law, then what would happen is that you'd be federalizing any breach of fiduciary duty. You could posit a number of theories where you have information conveyed from the originating source, from the market participant, which the securities laws are intended to protect, flowing through a secondary source like fidelity here. And then if there's a breach of the duty from fidelity to the trader, then that would be a violation of the federal securities law. I think that's way, that's an expansively overbroad reading of the law and federalizes state court jurisdiction. So common law fiduciary violations. Except for the requirement that the information must be used in connection with the purchase or sale of a security. Well, I think you can find that in any trading case, because in any trading case... Right, so it wouldn't be any breach of fiduciary duty. I mean, you could look at it the other way. I was trying to look at it the other way. If the law were that a director could take any information that had to do with a portfolio company's potential acquisition, movement in the market, potential decision to acquire another company itself, and go out and act on it, could you ever trust your directors? How many directors would you have in your company? Because everybody would be acting contrary to the interests of the board on which they sat. Your Honor, I think the restatement speaks to that very issue. The restatement and principles of corporate governance, rather, that we cite in our brief make it clear that a director can take information regarding another company and trade on it, profit by it, even if it's information conveyed in the context of his or her job as a director. But not confidential information. Even if it's confidential, as long as by so doing you do not harm the original company. So your whole case comes down to the question of whether or not there was harm to fidelity. No, I don't think that that's the only thing it comes down to. Although it's clear the SEC didn't allege or elicit any evidence of harm. I think there's a serious issue on confidentiality here. I absolutely do. This is not a situation where it was clear at the board meeting that this information was being conveyed confidentially. The only evidence in the record is the subjective belief of a couple of the directors who said, I believe, as your Honor indicated, that information received at a board meeting is, by its very nature, confidential. I don't think the law has gone that far. This, in Mr. Talbot's view, according to his testimony, was anecdotal information at the end of a board meeting that was not an agenda item and was not given for the purpose of eliciting a vote. I think the SEC has conflated two pieces of factual information. There's an April 18th conversation, which is the initial conversation. Then there's an April 25th conversation that's in the record. And at that time, Lendon Tree calls Fidelity and says the deal is about to happen. Far from the week before where they said it might happen, and we need to lock up your shares. And they propose a voting trust agreement and a confidentiality agreement. The district court properly found it was at that time that Fidelity became disabled from trading on that information. And so I do think there's a serious point as to whether the information conveyed was of the nature, first of all, was material, but more importantly, was confidential in the classic sense. Harm, I believe, is also a strong point. But I don't mean to pin our entire argument on the harm point, and that was the reason for that explanation, Your Honor. Do I need to address the question of materiality? Because it would seem to me that knowledge of potential acquisition of a company that would benefit the company on which you sit on the board would significantly alter the toll mix of information to any reasonable investor. Why is that a question of fact here? Well, let me make a few points. Number one, as the Court knows, materiality is inherently a question of fact. Not always, but inherently a question of fact. Number two, the district court analyzed this very question and pulled from the record the disputing evidence. First and probably foremost, to rebut the SEC's argument, they say that the proof is in the pudding. When the merger was disclosed, the stock price went up 41 percent. But that wasn't the information disclosed on April 18th or 19th. The information that the Court grappled with and found that there was a question of fact of materiality was that there might be a potential acquisition. There were so many facts that were not conveyed on April 18th or 19th, which are different from what is disclosed on May 5th, that you're talking about two different pieces of information. I would agree if the phone call on the 18th was the merger will happen tomorrow, the price is this. If it were that definite, then I think the district court would have had a harder time coming out the way Harana did. But in this case, the facts were not the way they were on April 18th or 19th. There was no discussion of the price of the deal. There was no discussion of who the potential buyer might be. There was no discussion of the terms of the deal. There was no discussion of when the deal would happen. All of those facts, Your Honor, I think put this case on the issue of materiality into the factual dispute category. Your Honor, while I have just a few more minutes, I want to talk about the history of the misappropriation doctrine because I do think that for my argument to make sense, I think the court has to look way back to Chiarella, which is the first case in the Supreme Court which even discusses the potential application of something which later became the misappropriation. What's interesting about Chiarella in my view, number one, the court didn't address it because the jury hadn't been instructed on that theory of liability. But that was, as the court knows, a financial printer case. So the printer trades on information that he learns from his company, similar to this situation, Mr. Talbot and his company. What the government argued on appeal in that case was not that the printer breached a duty to his company but breached a duty to the acquiring company, the owner of the information, the company whose information was being printed by the print shop. Now, that's not a holding, but I think it's interesting that at its very nascent time period, there was a recognition by the government that the originating source, the owner of the information, the party to be directly harmed has to be, A, a market participant with minor exceptions, Carpenter being one, but more importantly has to be the one to whom the duty is breached. The government did not argue that it was the purveyor of the information whose duty was breached, but rather argued that it was a breach to the owner of the information. Then we have, of course, O'Hagan, and I think, and I'd like to conclude on this if I could. I think what the district court, in a very thoughtful opinion, got absolutely right was the way the court concluded by saying, having reviewed O'Hagan and all of the misappropriation cases, including Cassessi, including Kim, including Chessman, said, quote, in all of these cases, the trader and the originating source of the nonpublic information were linked through a continuous chain of fiduciary relations. For this reason, the court in O'Hagan characterized both the client and the law firm as the source of the information on which the firm's employee traded. Now, I want to conclude on the waiver point, which I think, Judge Okuda, you asked early on in the SEC's argument. I don't think it's exactly the way the SEC quoted it. In the court below, at the oral argument, following colloquy occurred, the district court asked, don't you have to have some other duty to make your case here beyond that? And the that, in context, was the duty between fidelity and the fatality. Don't you have to have a duty between fidelity and lending tree? That's the supplemental excerpt for record at page 36. Counsel for the SEC replied, yes, Your Honor, I was going to get to that duty, which I will right now. We believe that the relationship between fidelity and lending tree was one that's equivalent to a fiduciary duty. There's no question they argued, not as an alternative argument, but as their argument, they recognized that you needed a continuous chain of duties. The Court of Appeals case law is very clear, as recently as last week in the Thain opinion, where Judge Waldorf said, if an argument is not made below, the general rule is that it is waived. What do you make of the statement in the district court case that the argument that the SEC made was the one that they're making here? Well, I think they did make that argument in part. I don't think the judge was saying that they didn't also make the other argument. The court goes on to analyze the other argument, meaning the duty to fidelity between fidelity and lending tree. I don't think they were saying that's the only argument they raised. But they didn't waive the argument, which the district court identifies as being the SEC's argument. No, they didn't waive the argument that a duty has to be owed between fidelity and Mr. Talbot. The waiver that I would submit that the court could affirm as an independent basis is, at the district court level, they argued to Judge Morrow that there were two duties that needed to be found, a duty between the originating source, the owner of the information, the party whose information is being stolen under a misappropriation theory, and the purveyor, and between the purveyor and the ultimate traitor. And that's what O'Hagan said, though I will concede it didn't elucidate the argument as I wished it had. But the mere discussion of it suggests that it's not enough for the duty to be owed to the purveyor. And I believe if you look at all of the misappropriation cases, I think that it is clear what is being misappropriated in those cases is something that rightfully is owned, not rightfully being held, but rightfully owned, like in Carpenter, by the originating source of the information. Unless there are other questions, I would submit the argument. All right, thank you, Counsel. Thank you, Your Honors. Your Honors, first on the waiver point, if you look at the excerpts of record on page 158, the district court says the SEC contends that the only relevant source for determining Talbot's liability is fidelity. So certainly the district court understood after hearing that that's what the SEC's argument was. If I could briefly touch on O'Hagan, because that's the Supreme Court case where the Supreme Court accepted the government's theory of misappropriation, and just briefly, the rationale for the misappropriation theory accepted by the Supreme Court in O'Hagan was this. A key purpose of the Exchange Act is to promote investor confidence. Someone who trades on misappropriated information undermines investor confidence, the Supreme Court says, not just the government. The reason is that the misappropriator has gained an informational advantage over other investors in a way that other investors cannot overcome by honest research or by skill or by knowledge. Because the misappropriator is deceptively breaching a duty and using that information, the misappropriator has gained an informational advantage over other investors, and that undermines investor confidence. That rationale fully applies in this case where Talbot breaches a duty to fidelity. There is nothing in that rationale or in O'Hagan that would suggest that an additional duty is required. And let me briefly touch on the reason in O'Hagan that the Supreme Court talked about two sources. The Supreme Court first said the misappropriation theory requires a duty to the source. The court said there are two sources in this case. The court pointed out, as we touched on briefly, deception can be cured by full disclosure. But the court pointed out, you have to make full disclosure to both sources. So if there's more than one source, as in O'Hagan, and the question is, what do you need to do to have full disclosure? Well, the Supreme Court said, if you want full disclosure to eliminate deception, it has to be the two sources. That's one reason O'Hagan talked about the two sources. The other reason it talked about it was because the Supreme Court in O'Hagan rejected a broader view. Chief Justice Berger, back in Chiarella, advanced, in dicta because it wasn't presented, advanced a view that if you misappropriate information, you owe a duty to all the other traders in the market. That was Berger's theory. The Supreme Court in O'Hagan rejected that. They said we're not adopting a misappropriation theory that's that broad. We're adopting a theory that requires a duty to the source. And in this case, there were two sources. So again, nothing in this discussion in O'Hagan about there being two sources suggests that there is a requirement for two sources. Now, the other argument on confidentiality, our position, as I tried to sketch in the opening argument, if you look at all the facts and circumstances here, this information, what it was, where it was disclosed at board meeting and so on, that's what makes it confidential. An explicit agreement of confidentiality is not a requirement to show a breach of duty. And the Supreme Court said that in its carpenter decision on mail fraud, and that carpenter decision is cited in our brief. If there are no further questions. No. All right. Thank you very much, counsel, for an excellent argument on both sides. SEC v. Talbot will be submitted.
judges: Thompson, Wardlaw, Ikuta